Filed 1/29/21  Colborn v. Chevron U.S.A. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| SUSAN COLBORN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CHEVRON U.S.A. INC.,<br><br>        Defendant and Respondent. | A159040<br><br>(Contra Costa County<br>Super. Ct. No. MSC14-01280) |

Appellant Susan Colborn challenges the trial court's grant of summary judgment to her former employer, Chevron U.S.A. Inc. (Chevron), on her claims under the Fair Employment and Housing Act (FEHA) (Gov. Code § 12900 et seq.) of retaliation and failure to prevent retaliation.[1]  Applying de novo review and employing the burden shifting approach to FEHA claims adopted by our high court in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 (*Guz*) and subsequent cases, we conclude that Chevron met its burdens to show Colborn could not establish a prima facie case and that it acted for legitimate nonretaliatory reasons and that Colborn failed to raise triable issues precluding summary judgment.  We therefore affirm.

---

[1]  This is the third appeal in this case.  In earlier consolidated appeals, we reversed the trial court's denial of Colborn's request for relief from default and associated award of costs to Chevron.  (*Colborn v. Chevron U.S.A. Inc.* (Mar. 26, 2019, A150831, A151494) [nonpub.].)

# BACKGROUND

## I.

### *Colborn's First Amended Complaint*

In her first amended complaint (FAC) against Chevron, filed in 2013, Colborn alleged that she worked for Chevron and one of its wholly owned subsidiaries from 1988 until her termination in March 2011. In January 2011, her supervisor informed her that management had ultimately assigned to an employee (referred to as a "direct report") who directly reported to Colborn, Terry Reich, a performance rank that was lower than what had been previously "agreed upon" in a meeting that had been held in late 2010. Colborn contacted the human resources department and informed them she thought Reich's final ranking was unfair but was told it would not be changed and that Reich had fallen behind his peers.

The FAC further alleges that on February 23, 2011, she received her own ranking from her supervisor, Denise Souza. This ranking was "the lowest she had received in her 23 years of employment with Chevron," and she believed she was given that low rank "because of and/or in retaliation for her refusal to participate in what she believed was illegal discrimination, based on age." While somewhat unclear, the FAC appears to be alleging that Colborn believed the low score given to Reich was age discrimination and that her refusal to give that low score to him "was the reason behind adverse employment actions [against Colborn] including, but not limited to reprimand, alleged insubordination and negative annual performance ranking." The FAC alleges that Reich "complained about suspected age discrimination and his performance ranking was changed (to what [Colborn] initially prepared) as a result."

The FAC further alleges that Colborn "filed an intake questionnaire with the [Oakland office of the U.S. Equal Employment Opportunity Commission (EEOC)] regarding this issue" on February 25, 2011, and "spoke with an EEOC investigator at the Oakland office and completed a charge of discrimination" on March 8, 2011. When she returned to Chevron from a vacation on March 9, 2011, she found " 'Steps to Employee Problem Solution Process' ('STEPS') paper work for [Reich] in her Inbox." The same morning, Souza asked to meet with her to discuss what Colborn "wanted to include in the STEPS paperwork." She met with Souza and a representative from human resources, who were "abrasive in confronting" her, which she believed "was retaliation as a result of her speaking with the EEOC." Colborn contacted the EEOC again and "informed them of the situation."

The next day, March 10, she emailed Souza's supervisor regarding the issues that had arisen the day before. That afternoon, Souza and a Human Resources representative came to her office, confiscated her badge, company Blackberry and credit card, and told her security guards would escort her out of the building. On March 11, 2011, Colborn returned to the EEOC Oakland office and filed a subsequent charge for unfair termination, and later filed a complaint with the California Department of Fair Employment and Housing (DFEH).

The FAC asserts two causes of action, both for violations of a provision of FEHA, Government Code section 12940. The first, under subdivision (h), is based on the allegations that defendants "retaliated against her for refusing to participate in and complaining about unlawful discrimination on the basis of age" and that "the stated reasons (insubordination) for her termination were pre-textual." The real reason for her termination, the FAC alleges, was "her refusal to change her performance review of another

3

employee, (Terry Reich) which she reasonably believed it was discriminatory [*sic*]—based upon that employee's age rather than his performance."  The FAC also alleges Colborn "was instructed by her supervisor to change her performance review of Mr. Reich, and when she refused and complained, she was disciplined for insubordination" by having her employment terminated. According to the FAC, Colborn's complaints and refusal to participate in suspected age discrimination against Reich were a motivating reason for her termination.  The second cause of action, under Government Code section 12940, subdivision (k), alleges that Chevron had constructive notice of and failed to take reasonable steps to prevent the alleged discrimination and retaliation against Colborn.

## II.

### *The Summary Judgment Record*

The parties' papers regarding Chevron's motion for summary judgment flesh out the events referred to in the FAC.  According to these papers, in 2009, after Colborn had worked for Chevron and one of its subsidiaries for 21 years in positions in the United States and abroad, her assignment as an expatriate ended, her visa expired and she sought a new position within the company.  In her previous positions, Colborn was "promoted up through 10 pay grades" and "consistently recognized as a technical resource, for producing quality work, and for meeting [her] responsibilities no matter what assignment [she] was given."  In June 2009, Colborn was within days of being terminated for lack of a position when Souza, the manager of Chevron's Operational Excellence Organization for the Business and Real Estate Services division (CBRES), hired Colborn for a management position. Colborn knew Souza from earlier in her career at Chevron.

From the beginning of her employment with CBRES, Colborn appeared to Souza to be disinterested in the work. She told Souza she was "trying to 'post' out of the group and find another position . . . in the Global Upstream & Gas ('Upstream') organization where she had previously worked as an expatriate." She spent significant time, while working, applying for other positions and inquiring about the status of the selection process for those positions. Souza inferred Colborn had accepted the position in CBRES "only so she would not be terminated when her expatriate assignment had previously ended." As of April 2010, ten months into her new position, she wrote that her career goal was to return to Upstream as soon as possible.

Souza discussed some performance deficiencies with Colborn during their regular one-on-one meetings. Among other things, Colborn "was not an effective supervisor, did not manage her direct reports, including Reich." Souza did not oppose Colborn applying for other jobs. However, Souza spoke with Colborn about the fact that she was not sufficiently "focused on the work required of her position because of the inordinate amount of time she spent trying to return to the Upstream organization where she previously worked." And in November 2010, having recently received complaints that Colborn's conduct in seeking other positions was disruptive and inconsistent with established protocol, Souza consulted with Human Resources, counseled Colborn about the issue and gave her a written warning.

Chevron's performance evaluation process is referred to as the "Performance Management Process," or "PMP." That process entails reviewing employees on "their overall performance, behavior, and accomplishments *relative to their peers*, and their contributions to the success of their group." Employees complete portions of a PMP form describing their own achievements and their supervisors then review the form and add their

own comments.  Then, at meetings with other supervisors, employees are "collectively discussed and given a numerical rating of 1 ('Exceptional Performance'); 2+, 2, or 2- (varying degrees of 'Meets Performance Expectation'); or 3 ('Falls Short of Performance Expectations'), as compared to the performance of their peers."  Peers are "individuals in the organization that are at the same [pay grade]."  A supervisor "may have in mind an initial rating for the employee going into the ranking sessions," but "that rating may change during the ranking discussions."

On February 24, 2011, Colborn received her 2010 PMP, and Souza discussed the ranking with her.  She was ranked "2-."  That meant she was meeting most, but not all, expectations and performing at a level below that of her peers.[2]  Souza discussed with Colborn why she was ranked lower than her peers and areas where she needed to improve.  The feedback section of the report contained a mix of positive and negative feedback.  Colborn received a pay raise after getting this rating.

One of Colborn's important duties as a manager was to effectively supervise her direct reports, including Reich.  She was responsible for managing their performance, including coaching and counseling them as necessary.  She was also responsible for conducting their performance reviews.  Throughout 2010, Colborn had expressed concerns about Reich's performance, complaining that he was not completing his tasks on time and that she often had to perform his work for him.  She told Souza she "planned to 'let him fail' to 'prove' that he had performance deficiencies."  Souza told her that, as Reich's supervisor, "it was her job to coach him and to ensure she provided him feedback on his performance so he could improve."

---

[2]  Colborn had received a "2" rating in 2008, before she joined CBRES, and in 2009.

Toward the end of 2010, Souza and Colborn discussed Reich's performance ranking and agreed on a tentative ranking of "2-." Colborn agreed to that ranking and thought it was "a fair assessment because Mr. Reich had inconsistent follow through, a subject [she had] discussed with Ms. Souza throughout 2010." There had been three "substantial projects" that year for which Reich "required coaching with little to no progress." He had not completed one project and Colborn had to perform much of his work on another. During the management team meeting about Reich's initial ranking, the subject of his age never came up.

During subsequent sessions attended by other managers and supervisors to discuss employees' performances and compare them to those of their peers, it was decided that Reich's "rating for 2010 was a '3' because he was not meeting expectations relative to his peers." Colborn understood that Reich's rating could be changed during this discussion. The final ranking was determined at a meeting Colborn did not attend, where the subject of Reich's age did not come up. Souza told Colborn Reich had been ranked a "3" because he had not performed as well as his peers, and provided notes that indicated he was "falling short of expectation along the way" and had been coached "with no progress."

Colborn did not believe "3" was a fair rating for Reich. On February 22, 2011, Souza told her to "come up with a reason for Mr. Reich's final rating, stating something to the effect of 'just figure something out,' or 'you'll think of something.'" However, Colborn never told Souza or anyone else at Chevron that she believed Reich had been rated a "3" or been treated unfairly because of his age.[3] She did not remember complaining, nor recall ever having formed

_____

[3] Colborn purported to dispute this fact, which was asserted in Souza's declaration, based on her *inability to recall* whether she complained to

7

the opinion, that Reich's rating was reduced from "2-" " to "3" based on his age. She simply believed the "2-" rating "was a fair assessment because Mr. Reich had inconsistent follow through, a subject I discussed with Ms. Souza throughout 2010." Colborn recalled that Reich's tendency to miss deadlines or his "commitment follow-through" issue was "why we ended up where we did with his final rank."

Chevron policy required that supervisors of employees who received a rating of "3" create a Performance Improvement Plan, or "PIP," to assist the employee to improve. A PIP is not a disciplinary measure; it is "a tool used to focus employees on areas needing improvement in order to help them to succeed." Souza and Bob Howisey of Human Resources reminded Colborn multiple times that Reich's "3" rating required a PIP and provided her information to assist her in creating one. Souza and Howisey directed Colborn to explain the reasons for the rating to Reich and discuss his performance deficiencies so that he understood what areas he needed to focus on and develop.

Colborn did not want to participate in putting Reich on a PIP because she disagreed with his "3" rating. She never prepared a PIP for Reich or placed him on a PIP. Instead, she met with Reich and delivered the message that his rating was a "3" because he had not performed at the level of his peers. She did not "say anything more because [she] was not comfortable just making something up and [she] had no more specific information regarding the comparison with his peers or otherwise."

After receiving his rating, Reich complained to Souza and Colborn that Colborn had not given him feedback and said he had questions about the

anyone at Chevron that she believed Reich's final rating was based on his age rather than his performance. Not recalling whether an event occurred is not evidence that it did occur and does not raise a genuine issue of triable fact.

rating. He emailed Souza and Colborn, requesting "the detail PIP [*sic*] that will identify and validate that [his] performance fits in this category" and stating he wanted "written specifics." He complained that he "should have been aware in 2010 if [his] performance was lacking." He requested "more detail on where [he] fell short in 2010" and, once he received the PIP, that someone "go over the details and address those areas that are identified" with him. Colborn responded with a two-sentence email stating, "I do not have anything further of value to add" and "I am sorry you feel the way you do." In Souza's view, "[t]his was not an acceptable response by a manager."

Reich filed a formal complaint with Human Resources, invoking a "process [called STEPS] that involves having a facilitated discussion between the supervisor and employee to resolve disputes." Souza declared, apparently in connection with the STEPS process, that "[i]t was discovered that Ms. Colborn had not provided Mr. Reich adequate feedback during the performance year as she and [Souza] had previously discussed she would do when she expressed concerns to [Souza] about Mr. Reich's performance." Colborn partly disputes this, stating she "provided constructive feedback" to Reich throughout 2010.

On February 28, 2011, Reich emailed Souza and Howisey stating that Colborn had said "she would not be helping [him] with the PIP [and] to contact [Howisey]." Howisey advised Souza, "The PIP is [Colborn's] responsibility as [Reich's] supervisor. She needs to own this from start to finish as she will be the one determining if he has successfully met the PIP expectations." Howisey said he might need Souza's "assistance in helping [Colborn] understand what her responsibilities are if [Reich] is correctly quoting her that she would not be helping him with his PIP."

Colborn took a vacation at some point and returned on March 9, 2011, to find Reich's formal STEPS complaint in her email inbox. In it, Reich stated, among other things, "I feel because of my age, being a white male and years of experience, I am being targeted and discriminated against." At some point previously in 2011, Howisey had made a comment in Colborn's presence about Reich "not keeping up with his peers and that [he] should retire or leave." Colborn was concerned about Reich's final rating "and his belief that he was being discriminated against based on age." However, as we have stated, Colborn does not remember ever thinking Reich's performance rating was made a "3" rather than a "2-" because of his age or expressing such a belief to anyone at Chevron.

On March 9, 2011, Souza attempted to meet with Colborn to discuss responding to Reich's request for specific information regarding his performance rating. She stopped by Colborn's office at about 11:15 a.m. and was taken aback when, according to her, Colborn refused to meet with her. When asked why, Colborn said she wanted more information about her own performance rating, which Souza viewed as unrelated to Souza's request to meet with Colborn about Reich's need for feedback. According to Souza, even though she offered to talk with Colborn about her own rating again, Colborn "reiterated that she was unwilling to meet," and told her "that if I wanted anything from her, I needed to put it in writing because she would not have a verbal discussion."

Colborn denied telling Souza she would not meet with her but admitted she "asked [Souza] why we were meeting, for specifics" and told Souza she would need to put in writing an agenda of what was going to be discussed before Colborn would meet with her. Colborn agreed that she asked Souza "about discussing my 2010 review."

After "giving Ms. Colborn some time to reflect," Souza emailed her at 1:57 p.m. that same day, stating she wanted to meet at 3:00 p.m. to discuss Reich's request for information. Colborn responded that she had just sent Souza the completed comments for Reich's STEPS documentation and that Souza was "welcome to follow-up with Bob [Howisey] as needed."[4]

Souza continued to press for a meeting, writing to Colborn that she had asked Howisey "to come over at 3pm to meet with us" and that "we'll come by at 3pm to pick you up." Colborn, copying Howisey, responded again, "You have everything you need from me as [Reich's] Supervisor. Please feel free to make comments in the documents that I have provided to you."

This time, Howisey followed up, writing, "Susan, I'm sorry but I disagree. [¶] What you provided is not satisfactory for several reasons. [¶] In addition I need to understand what happened this morning on your refusal to meet with [Souza] to address this important STEPS issue. [¶] We will see you at 3:00." Colborn responded, "Thanks Bob. As mentioned, you have what is needed from me as [Reich's] Supervisor. I am happy to review written comments/additions from you and Denise."

According to Souza, at 3:00 p.m., she and Howisey went to Colborn's office, where Colborn saw them through a window while on a phone call. Colborn interrupted her call to tell them she would not meet and asked them to put everything in writing, to which Souza responded that they would wait

---

[4] In its moving papers, Chevron did not include the STEPS documentation that Colborn sent, but Souza's declaration describes it as "insufficient" and "not adequately or specifically inform[ing] Mr. Reich of the reasons for his '3' rating as he had requested." Colborn's declaration attached the STEPS documentation, in which she stated to Reich that she believed a ranking of "2-" "fairly represents your performance for 2010" and that she was told the ranking of "3" was "relative to your peers," but that she "did not receive any specific information on this decision."

outside while Colborn finished her call. According to Souza, "[a]fter a few minutes, Ms. Colborn narrowly opened her door to prevent us from entering and stated she would not meet. She repeatedly told us 'no,' she would not meet. She then closed the door and went back to her desk." Howisey then opened her door and "specifically told her that our request to meet was a direct instruction, that refusing to meet would be considered insubordination, and he asked if she would please reconsider." Colborn still refused and said, " 'I will not meet with you. Please just write me up,' and closed her door."[5]

Colborn's account of these events is similar, but it varies in two respects. First, she denied telling Howisey she would not meet with him and Souza. However, a document she attached to and authenticated in her declaration as an email she wrote to herself the following day, which she stated "describ[es] this incident," states, in relevant part: "I returned to work from vacation yesterday. Yesterday afternoon, Denise [Souza] made arrangements for me to meet with her and Bob Howisey to discuss Terry Reich's STEPs process. Terry is using STEPs because he believes that his salary treatment is also unfair. Prior to the meeting I completed the Supervisor's comments and forwarded them to Denise and Bob. *There was no reason to meet with them.* When they arrived at my office, from the hallway Bob critized [*sic*] my STEPs comments, told me they were 'sad' and then *threatened me with insubordination because I would not meet with them.* This was very disrespectful and demeaning. So I went ahead and told them both that they were retaliating and I was going to contact the EEOC, as that is what I told to do [*sic*] when I met with the representative on Tuesday. I contacted the San Francisco office because I could not get anyone in

---

[5] Souza's notes of these events, made that afternoon, are consistent with this account.

Oakland." (Italics added.) When shown this document at her deposition, excerpts of which were submitted by Chevron, Colborn admitted it was accurate.

Colborn also admitted in deposition that, after receiving Souza's email about meeting with her and Howisey at 3:00 p.m., she understood Souza "was insisting that they come and talk to [her]" and that "they still wanted to meet with [her]." Further, she acknowledged that her responding email telling Souza she had "everything you need from me" and to "feel free to make comments in the documents" was telling Souza that she "didn't think it's necessary to meet." She sent the same message to Howisey after he intervened.

In her declaration and response to Chevron's statement of undisputed facts, Colborn also admitted that when Souza and Howisey arrived at her office and tried to speak with her, she spoke to them in the hallway and (again) "told them that [she] had given [her] comments and there really was not anything else [she] could add." In her deposition, she admitted she understood at the time that Howisey was instructing her she had to meet with Souza and that Howisey told her "that [she] would be insubordinate if [she] didn't meet with them." She also admitted she told Howisey "to document it, to write [her] up." In an email she wrote to Souza's supervisor the day after these events, she stated that Souza made arrangements to meet with her and Howisey, that "*[t]here was no reason to meet with them*" and that Howisey "threatened [her] with insubordination because [*she*] *would not meet with them*." (Italics added.)

Colborn's second variation from Chevron's account is her declaration statement that she told Souza and Howisey they were "retaliating and that [she] would contact or had already contacted the EEOC."

13

On March 10, 2011, Souza and a person from Human Resources informed Colborn that her employment was being terminated. According to Souza, Colborn was fired "based solely on her insubordinate and unacceptable behavior."

## III.

### *The Trial Court's Ruling*

The trial court issued a lengthy ruling granting Chevron's motion for summary judgment. The court explained the bases for its ruling, which included its conclusions, in applying the burden-shifting *McDonnell Douglas* test (which we will soon discuss), that Colborn was required but failed to show she engaged in any protected activity; Chevron demonstrated a valid and lawful reason for firing Colborn; and Colborn did not raise a triable issue of fact regarding whether the firing was pretextual.

The court entered judgment in favor of Chevron and against Colborn, and Colborn timely appealed.

## DISCUSSION

## I.

### *Legal Standards*

### A. Summary Judgment

Summary judgment is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "[G]enerally, the party moving for summary judgment bears an initial burden of production to make

prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid*.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id*. at p. 851.)

"[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial." (*Aguilar, supra*, 25 Cal.4th at p. 851.) "[I]f a defendant moves for summary judgment against [a plaintiff who would bear the burden of proof by a preponderance of the evidence at trial], he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law,* but would have to present *his* evidence to a trier of fact." (*Id*. at p. 851.) To establish a triable issue of fact, a plaintiff opposing summary judgment must present evidence that, together with permissible inferences, shows the conduct she complains of "more likely than not" occurred. (*Id*. at pp. 852, 856-857.) If all the evidence presented by the plaintiff and permissible inferences show and imply that unlawful conduct is "only as likely as permissible" conduct "or even less likely," the court must grant the defendant's motion for summary judgment, "because a reasonable trier of fact could not find for the plaintiff." (*Id*. at pp. 852, 857, italics omitted.)

Finally, "even though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact. . . .* In so doing, it does not decide

on any finding of its own, but simply decides what finding such a trier of fact could make for itself." (*Aguilar, supra,* 25 Cal.4th at p. 856.)

We independently review an order granting summary judgment. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) Like the trial court, we consider all the evidence and all the inferences reasonably drawn therefrom (Code Civ. Proc., § 437c, subd. (c); *Aguilar,* at p. 843) and view such evidence and inferences in the light most favorable to the opposing party. (*Aguilar,* at p. 843.) We "view the evidence in a light favorable to plaintiff" as the nonmoving party, liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing and resolving any evidentiary doubts or ambiguities in plaintiff's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

## B. FEHA Retaliation Claims

Colborn's retaliation claim is based on the retaliation provision of FEHA, which makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA]." (Gov. Code, § 12940, subd. (h).)

In *Guz, supra,* 24 Cal.4th 317, the California Supreme Court adopted the "three-stage burden-shifting test established by the United States Supreme Court" for trying discrimination claims brought under FEHA. (*Guz,* at p. 354.) That test, known as the *McDonnell Douglas*[6] test, applies not only to discrimination claims but also to FEHA claims alleging retaliation. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

The *McDonnell Douglas* test "places on the plaintiff the initial burden to establish a prima facie case of discrimination." (*Guz, supra,* 24 Cal.4th at

---

[6] The test was first established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

p. 354.) If the plaintiff meets that burden, a presumption of discrimination arises. (*Id.* at p. 355.) The presumption, which is rebuttable, shifts the burden to the defendant employer to produce evidence showing it acted "for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355-356.) "If the employer sustains this burden, the presumption of discrimination disappears." (*Id.* at p. 356.) "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. [Citations.] The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Ibid.*)

To establish a prima facie case of retaliation under FEHA, plaintiffs must show " 'that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action.' " (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1192-1193.) The causal link element required to satisfy plaintiff's *first prong* burden may be established "by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." (*McRae v. Dept. of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388.)

If the plaintiff meets that first prong burden, a presumption of discrimination or retaliation arises, shifting the burden to the employer. (*Guz, supra,* 24 Cal.4th at p. 354.) "If the employer produces substantial evidence of a legitimate, nondiscriminatory reason for the adverse

employment action, the presumption of discrimination created by the prima facie case ' "simply drops out of the picture" ' [citations] and the burden shifts back to the employee to prove intentional discrimination." (*Morgan v. Regents of University of Cal.* (2000) 88 Cal.App.4th 52, 68 (*Morgan*).)

The employer's burden under the second prong is to articulate a legitimate reason for its employment decision, that is, one unrelated to retaliation or discrimination. This "likewise is not an onerous burden [citation], and is generally met by presenting admissible evidence showing the defendant's reason for its employment decision." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160 (*Wills*).) "[I]f nondiscriminatory [or nonretaliatory], [the employer's] true reasons need not necessarily have been wise or correct." (*Guz, supra,* 24 Cal.4th at p. 358.) " 'It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case.' " (*Wills*, at p. 170.)

"If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of [retaliatory] motive." (*Guz, supra,* 24 Cal.4th at p. 354.) "Direct evidence of retaliation may consist of remarks made by decisionmakers displaying a retaliatory motive." (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 816.)

In *Guz*, the court addressed to a great extent how the *McDonnell Douglas* formula applies to an employer's motion for summary judgment against a claim of employment discrimination. (*Guz, supra,* 24 Cal.4th at

p. 356.)[7] As the moving party, the court observed, an employer may meet its burden to show the plaintiff's action has no merit by demonstrating that one or more elements of the plaintiff's claim cannot be established or that there is a complete defense to the action. (*Ibid.*). "Only after the defendant has met that burden must the plaintiff respond with admissible evidence raising a triable issue." (*Ibid.*) As an alternative or in addition to showing the plaintiff cannot establish an essential element of a FEHA claim, the defendant may "proceed[] directly to the second step of the *McDonnell Douglas* formula" by "set[ting] forth competent, admissible evidence [citations] of its reasons, unrelated to [prohibited] bias, why it [took the complained of adverse employment action]." (*Id.* at p. 357.) If the employer's explanation is proved by competent and admissible evidence and its reasons are unrelated to intentional bias, the burden shifts to the plaintiff "to *rebut* this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Ibid.*; *id.* at p. 360.)

## II.

### *Analysis*

Chevron contends it was entitled to summary judgment because, first, it demonstrated that Colborn could not make a prima facie showing of

---

[7] The court did not resolve an issue that has divided the appellate courts, which is whether a plaintiff is required to demonstrate a prima facie case "at the outset" or only after the moving defendant has made a showing that the plaintiff cannot establish one or more elements of her prima facie case or meet its burden under the second prong of *McDonnell Douglas* by showing its action was based on legitimate, nondiscriminatory factors. (See *Guz, supra,* 24 Cal.4th at pp. 356-357.) The defendant in *Guz* had made both the first prong and second prong showings, and thus the burden had unquestionably shifted to the plaintiff in that case. We need not resolve this issue here either because of the nature of Chevron's argument.

retaliation under FEHA and, second, even if Colborn could make such a showing, Chevron met its burden to establish a legitimate non-retaliatory reason for terminating her employment, which Colborn did not effectively rebut.

Colborn argues she met her prima facie burden by showing a temporal proximity between her engagement in protected activity and Chevron's adverse actions. She further contends that she raised triable issues of fact regarding whether Chevron had lawful reasons for the adverse actions it took and whether Chevron's purported reasons are pretextual or unworthy of credence.

More specifically, Colborn contends that she showed she had engaged in two types of protected activity: "complaining" and "refusing to participate in" what she believed was age discrimination. First, Colborn asserted in opposition to summary judgment, for the first time, that she informed Souza in June 2009 and April 2010, and Howisey in November 2010, that she had filed an intake questionnaire with the EEOC before coming to work for CBRES. Colborn argued her filing of that questionnaire constituted a "complaint" that raised a triable issue as to whether Chevron retaliated against her for this "complaining" to the EEOC by giving her a negative review and/or firing her. As we will discuss, Colborn's reliance on this theory was improper because it was beyond the bounds of the FAC and was based on evidence to which Chevron objected and that the trial court properly excluded.

Second, Colborn argued two theories of retaliation for protected activity that *were* referred to in the FAC. First, she asserted that her refusal to engage in age discrimination against Reich led Souza and Howisey to fire her. Second, she asserted that her threat to Souza and Howisey on March 9,

2011, that she had filed or intended to file an EEOC complaint also constituted a "complaint" that led them to fire her in retaliation.

## A. Colborn's Improperly Asserted Retaliation Theory

In its order granting summary judgment, the trial court sustained Chevron's objections to the portions of Colborn's declaration that referred to her having told Souza and Howisey she had filed an intake questionnaire with the EEOC in 2009 before she came to work at CBRES.[8] The court concluded this evidence was irrelevant because Colborn's FAC did not allege that Chevron retaliated against her for filing the intake questionnaire. The court rejected her theory of retaliation based on the 2009 questionnaire for that and other reasons.

The trial court was correct to reject this theory of protected activity. It is well established that " '[t]he pleadings delimit the issues to be considered on a motion for summary judgment. [Citation.]' [Citation.] Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' [Citation.] 'To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion. [Citations.]' [Citation.] . . . [Plaintiff's] separate statement of material facts is not a substitute for an amendment of the complaint.' " (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.)

---

[8] The record contains no written response to Chevron's objections, nor a transcript of the summary judgment hearing at which such objections might have been discussed.

Colborn concedes that she did not "specifically allege in her [FAC] any facts concerning the 2009 EEOC intake questionnaire," but asserts that she testified in her deposition about informing Mr. Souza or Mr. Howisey in June 2009, April 2010 and November 2010 that she had contacted the EEOC. She contends the standard for whether a court should consider a theory presented at summary judgment, rather than being based on what is alleged in a complaint, is "whether such a particular theory or defense is one that the opposing party could have reasonably anticipated would be pursued, and whether a request for leave to amend accordingly would likely have been granted." Colborn relies on a liberal framework applied in *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 385 and *Howard v. Omni Hotels Management Corp*. (2012) 203 Cal.App.4th 403. But even that framework requires that a pleading give the opposing party at least minimal notice of the theory asserted. (See *FPI*, at p. 385; *Howard*, at p. 422.) Here, the complaint did not give even minimal notice that Colborn was asserting any claim that Souza retaliated against her because of statements she made in 2009 and 2010 that she had filed an intake questionnaire with the EEOC in 2009 before she came to work for CBRES. The complaint simply does not allege that Colborn filed such a questionnaire or that she made any statements about a 2009 questionnaire to anyone at Chevron.[9]

---

[9] Colborn filed a request for judicial notice with this court seeking to introduce deposition excerpts of testimony by her that she discussed the 2009 EEOC questionnaire. Chevron did not initially oppose the request and, under the misimpression that the excerpts had been submitted to the trial court and inadvertently omitted from the record on appeal, we granted it. Chevron opposes the request in its respondent's brief and makes clear the excerpts were never submitted to the trial court. We therefore reconsider the request for judicial notice, sua sponte, and deny it. But even if we considered these excerpts, the outcome would be no different in the absence of any legal authority to support Colborn's legal argument.

The FAC does allege Colborn had two contacts with the EEOC, on March 8 and March 11, 2011.[10] These alleged contacts related to an intake questionnaire and complaint Colborn filed with the EEOC *in 2011*, and are coupled with the further allegations that Chevron "retaliated against her for . . . complaining about unlawful discrimination on the basis of age." They were (contrary to Chevron's argument) sufficient to put Chevron on notice that Colborn was basing her retaliation claims in part on her having stated that she filed or would file an EEOC complaint *in 2011*. However, these allegations about *2011* did not so much as hint that Colborn's retaliation claim was based on comments she purportedly made to Souza and/or Howisey in 2009 and 2010 about an EEOC questionnaire she submitted sometime early in *2009* when she worked for a different department of Chevron. The FAC alleges that "the real reason for [Colborn's] termination was her refusal to change her performance review of another employee, (Terry Reich) which she reasonably believed it was discriminatory [*sic*]—based upon that employee's age rather than his performance." The 2009 intake questionnaire Colborn referred to for the first time in opposition to summary judgment was, by her own characterization, made because of what Colborn considered "a forced relocation to Houston," an issue she "thought was closed because of the appointment to the new position" at CBRES. It did not relate to any alleged age discrimination against Reich, and thus had nothing to do with the retaliation claim alleged in the FAC.

In short, the trial court was correct to reject Colborn's intake questionnaire retaliation theory (and her related evidentiary submissions) on the ground that it was beyond the scope of the FAC.

---

[10] The FAC also alleges, presumably to show Colborn exhausted her administrative remedies, that she filed a complaint with the Department of Fair Housing and Employment in September 2011.

## B. Colborn's Properly Asserted Retaliation Theories

We turn now to the theories that *are* encompassed by the FAC and, therefore, were properly asserted by Colborn in opposition to Chevron's summary judgment motion, namely her age discrimination and 2011 EEOC complaint retaliation theories.

### 1. *Colborn's Age Discrimination Retaliation Theory*

Regarding Colborn's age discrimination retaliation theory, Chevron claims Colborn cannot establish the required causal link element of her prima facie case because "the evidence is undisputed that [Chevron] was unaware that [Colborn] allegedly engaged in any protected activity." As Chevron points out and our high court has instructed, "[s]tanding alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1046.)

We agree that Chevron has shown Colborn cannot establish the requisite causal element of her age discrimination retaliation claim. Chevron showed Colborn did not inform Souza, Howisey or anyone else at Chevron, prior to her termination, that she believed Reich had been rated a "3" unfairly because of his age or even that she formed an opinion that they were engaging in age discrimination against Reich. Rather, her claim appears to be that her failing to put Reich on a PIP as directed, explain adequately the bases for his rating, and meet with Souza and Howisey to discuss these matters constituted protected activity because she took these acts as part of

her opposition to age discrimination against Reich.[11]  However, the causal link between these activities and her termination is missing because there is no evidence suggesting Souza, Howisey or anyone else at Chevron knew or should have known these actions were an attempt by Colborn to oppose what she believed was discriminatory conduct.  Thus, Chevron has met its first prong burden of showing Colborn cannot make out a prima facie case on this theory.

Colborn fails to rebut Chevron's showing with evidence of a triable issue of fact on the causal link element.  Colborn does not even establish that she had a good faith belief that Reich's rating was based on age discrimination, much less that she somehow communicated such a belief to Chevron.[12]  Her declaration states only that she believed his rating was "unfair," and does not state that she ever communicated even this much to

---

[11]  Chevron correctly argues that there is no direct evidence that anyone asked Colborn to change Reich's rating.  However, we read the FAC and Colborn's summary judgment papers liberally to mean that her refusal to provide reasons to explain or justify Reich's final performance ranking of "3," refusal to put Reich on the PIP and refusal to meet with Souza and Howisey constituted the protected activity of refusing to "participate in what she believed was illegal discrimination based on age."

[12]  This case thus is unlike *Yanowitz*, in which the court held the evidence was sufficient to support a finding that by repeatedly refusing to implement a blatantly improper directive to fire a dark-skinned sales associate and replace her with a lighter-skinned blonde unless, she insisted, her superior provided " 'adequate justification,' " the plaintiff "sufficiently conveyed to [her superior] that she considered the order to be discriminatory and put him on notice that he should reconsider the order because of its apparent discriminatory nature." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1048.) There is no evidence here that Souza or Howisey engaged in such blatant or obvious age discrimination against Reich or that Colborn's failures to comply with their directives communicated that she was objecting to such discrimination.

Souza or Howisey.[13]  She argues that "[a]n employee is not required to use legal terms or buzzwords when opposing discrimination; opposition activity occurs if the employee's comments, when read in their totality, oppose discrimination."  This is an accurate statement of the law.  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1047.)  Nonetheless, an employee must say or do *something* that alerts the employer she has a concern about *discrimination*.  As our high court put it in *Yanowitz*, "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct."  (*Ibid*.)  " 'The relevant question . . . is . . . whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.' "  (*Id*. at p. 1047, quoting *Garcia-Paz v. Swift Textiles, Inc*. (D. Kan. 1995) 873 F.Supp. 547, 560.)

On this record, a jury could not properly find that an employer in Chevron's shoes reasonably could have been expected to understand, based on Colborn's behavior and the circumstances, that she was opposing what she thought was age (or any other type of) discrimination against Reich.  To be sure, Souza and Howisey could see that Colborn was reluctant to provide more feedback to Reich regarding his rating and to place him on a PIP, and

---

[13]  Colborn also states that after she returned from vacation and received Reich's STEPS paperwork in which he mentioned possible discrimination, she "was concerned about [his] final rating and *his* belief that he was being discriminated against based on age."  (Italics added.)  She does not state that she believed that was the case, and when asked whether she ever thought Reich's rating was a "3" "because of his age and for no other reason," she said she did not recall.  When asked whether she ever expressed to anyone at Chevron "that you believed the real reason Mr. Reich was given a three instead of a two-minus was because of his age," again she responded, "I don't recall."

they witnessed her unwillingness to discuss Reich's rating with them in person. But without additional information, the question of *why* she did what she did was something about which they could only have speculated. Absent any explanation by Colborn of the reasons for her conduct, her superiors were presented with a riddle or a conundrum, not with a recognizable expression of concern about discrimination against Reich. (See *Garcia-Paz v. Swift Textiles, Inc., supra*, 873 F.Supp. at p. 560 ["employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination"]; quoted with approval in *Yanowitz, supra*, 36 Cal.4th at p. 1047.) Further, it was a puzzle they could not definitively solve because she would not talk with them.[14]

Colborn also contends that the temporal proximity between her "protected activity" on March 9, 2011, and her termination on March 10, 2011, suffices to establish a causal link between the two. But, as we have just indicated, nothing about her behavior on March 9 or before explicitly or implicitly alerted Chevron that she was engaged in, as she puts it, a "subtle and indirect means of opposing what she reasonably understood to be Chevron's discrimination directed at Mr. Reich."

For these reasons, Colborn has failed to rebut Chevron's showing that she cannot establish a causal link between her purportedly resisting participating in age discrimination and her termination. Chevron was thus entitled to summary judgment on this theory.

---

[14] Indeed, Colborn's superiors could have reasonably thought her conduct was due to several plausible reasons that reflected poorly on her, such as her possible anger about her own negative performance rating and concern about its impact on her future at Chevron; her desire to move to another position within Chevron; her insufficient feedback to Reich during the year leading up to the rating; and her stated willingness to let him fail.

## 2. *Colborn's 2011 EEOC Complaint Retaliation Theory*

The second retaliation theory encompassed by Colborn's FAC is that when Souza and Howisey were outside her office in the hallway after their dispute arose, she told them "they were retaliating and that [she] was going to contact the EEOC." Chevron denies Colborn said anything about contacting the EEOC, but as the non-moving party, Colborn is entitled to have us accept her evidence as true for purposes of summary judgment.

Colborn contends that filing or threatening to file a complaint with the EEOC was protected activity and that it was because she engaged in this activity that Chevron terminated her employment. To establish the requisite causal link, she points to the facts that she threatened to contact the EEOC on March 9, 2011, and was terminated the following day. This theory and the evidence supporting it are sufficient to meet Colborn's required prima facie showing under the first prong of *McDonnell Douglass,* a causal link between protected activity and an adverse employment action. Therefore, we turn to whether Chevron met its burden under the second prong of *McDonnell Douglass* of showing a legitimate reason for its adverse action, thereby shifting the burden back to Colborn to make a third prong showing.

### a. Chevron Showed a Legitimate Reason for Terminating Colborn's Employment.

To rebut the presumption of retaliation that arises from Colborn's prima facie showing on her 2011 EEOC complaint retaliation theory, Chevron had the burden to produce evidence showing it acted, i.e., it terminated Colborn's employment, for a legitimate, nonretaliatory reason. According to Chevron, "the sole basis for [Colborn's] termination was her recalcitrant behavior in repeatedly refusing to meet with her supervisor (and [Human Resources]) to discuss an issue as common and important as a subordinate's performance."

We need not recount the evidence again in detail. Suffice it to say that it is undisputed that Colborn rebuffed in words and deeds repeated efforts on Souza's and Howisey's parts to meet in person with her on March 9, 2011. She said she would not meet with Souza without a written agenda, and she told them she had sent them what they needed, that they had everything they needed from her and that they could comment in writing. She intended to convey to them that she did not feel it was necessary to meet, and she failed to confirm she would meet them in her responses to the three emails they sent attempting to set up a meeting with her. She does not dispute that, when they showed up outside her office, she kept them from entering and spoke to them only "in the hallway." As the trial court aptly put it, "In this email exchange, [Colborn] did not use the words 'I refuse to meet with you.' But the exchange can only be interpreted as a stubborn and startlingly brazen refusal to meet, despite three unambiguous requests for a meeting from both [Colborn's] supervisor and a senior member of the Human Resources Department."[15]

We agree. Colborn made perfectly clear by her words and acts that she was not willing to meet with Souza or Howisey. And she did so even though she understood Souza was insisting on meeting with her, Howisey instructed her that she had to meet with Souza, and Howisey warned her she would be insubordinate if she did not meet with them. Instead of complying with Souza's and Howisey's requests and directives, Colborn told Howisey "to document it, to write [her] up."

Further, as Souza described it in her declaration in support of Chevron's summary judgment motion, she viewed Colborn's conduct as a

---

[15] In her declaration, Souza described Howisey as a "Human Resources Business Partner."

29

manager as "completely inappropriate, unprofessional, and insubordinate. Even if Ms. Colborn was trying to avoid delivering a difficult message to Mr. Reich about his performance, it was her responsibility as his manager to do so and to help Mr. Reich understand how he could improve. And, if Ms. Colborn was unclear about feedback on Mr. Reich, she needed to talk with me or with others who were present during ranking sessions when Mr. Reich was ultimately rated a '3.' It seemed that, as Ms. Colborn had told me earlier in 2010, she intended to 'let him fail,' which was unacceptable. [¶] Because of Ms. Colborn's insubordination on a subject as critical as providing feedback to a direct report, I could no longer entrust her with the critical supervisory responsibilities of her position. I recommended that day that Ms. Colborn's employment be terminated and the decision was supported by Human Resources. I genuinely felt that separation was the only logical and responsible consequence for Ms. Colborn's insubordinate behavior." Souza further stated in her declaration that "Ms. Colborn's termination was based solely on her insubordinate and unacceptable behavior."

This evidence is more than sufficient to meet Chevron's burden of showing a legitimate, nonretaliatory reason for the termination. (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 874, 875 [evidence that plaintiff failed to communicate with defendant regarding requested medical leave and failed to respond to defendant's requests for information about his condition and fitness to work was insubordination that constituted legitimate, non-retaliatory reason for terminating plaintiff's employment].) As in *Guz*, Chevron's explanation of its nondiscriminatory reason for terminating Colborn's employment was "creditable on its face" and Colborn "has largely conceded the truth, if not the wisdom, of [Chevron's] proffered reasons." (See *Guz*, *supra*, 24 Cal.4th at p. 357.)

"If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) We turn to whether Colborn has met this third prong burden on her 2011 EEOC complaint retaliation theory.

### b. Colborn Did Not Meet Her Third Prong Burden.

In evaluating a third prong showing we determine whether the evidence in its entirety proves "by nonspeculative evidence, 'an actual causal link between prohibited motivation and termination.' " (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1159 (*Featherstone*), quoting *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433-434.) As we have observed, "very little" direct evidence of an employer's discriminatory motive is necessary, but "[c]ircumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' [or retaliate] on an improper basis." (*Morgan, supra*, 88 Cal.App.4th at p. 69.)

Also, as we will discuss, Colborn relies on certain remarks by Souza and Howisey. In that context, particularly pertinent is our Supreme Court's directive that remarks of a discriminatory or retaliatory nature cannot be categorically excluded based on the court's assessment of their relative strength or probative value viewed in isolation, but rather should be considered in combination with all the evidence set forth in the papers and all inferences that reasonably can be deduced from that evidence. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 538-545.) Thus, we consider the relevance of any such remarks in the context of the entire record.

Colborn's briefs are not particularly helpful in identifying the evidence she relied on for her 2011 EEOC complaint retaliation theory because she relied on the following to show retaliatory motive without assigning any of these facts to one or the other of her different theories: Souza's "remarks in meetings in which [Colborn] was present" "[s]tarting around November 2009" "about employees filing with the EEOC" without "mention[ing] any names"; Howisey's statements to Colborn that her comments on Reich's STEPS document were "sad" and that she was "being insubordinate"; a "remark" made by Souza "[a]t the beginning of 2010" "about employees nearing retirement"; and a "remark" made by Howisey "[a]t some point in 2011 before March 9," "about Mr. Reich not keeping up with his peers and that Mr. Reich should retire or leave."

Of these four remarks, the first is the only one has anything to do with her theory that Chevron retaliated because she said on March 9, 2011, that she had filed or would file a claim with the EEOC.[16] And as we see it, the other evidence that pertains to her 2011 EEOC complaint retaliation theory is that, at the end of the March 9, 2011 interchange between Colborn and her superiors, after she was told that refusing to meet was insubordinate, she accused them of engaging in "retaliation" and threatened to file a complaint with the EEOC. The temporal proximity between her statements about the EEOC and her termination the very next day, she contends, supports a finding that she was terminated because of her statements about filing an EEOC claim. This, we have already held, suffices as a prima facie showing, but the inquiry now is whether, in light of Chevron's effective rebuttal, the evidence as a whole, including the remarks Colborn attributes to Souza,

---

[16] The other three are pertinent, if at all, to her age discrimination retaliation theory, for which we have concluded she cannot make out a prima facie case.

raises a triable issue as to the retaliatory motive Colborn asserts. It is at best extremely weak evidence that Chevron fired her because of her statement that she had filed or would file an EEOC complaint. Again, all Colborn's declaration says is that Souza made unspecified "remarks in meetings in which [Colborn] was present" "[s]tarting around November 2009" "about employees filing with the EEOC" without "mention[ing] any names." She does not state what the remarks were or even whether they reflected negatively on people who file such complaints. The comments were not directed to Colborn or anyone else in particular, and Colborn provides no context at all for the comments. The only time frame she gives for the comments is that they were first made in November 2009, long before her March 2011 termination. In short, there no evidence that the unspecified remarks were negative or that they had anything to do with Colborn, and there is no showing any such remarks were made close in time to Colborn's termination.

Even without considering Chevron's evidence of its nonretaliatory basis for firing her, these comments provide no reasonable basis for inferring animus on Souza's part toward Colborn or any other employee who had filed or might in the future file a claim with the EEOC. The fact that Colborn told Souza and Howisey she had filed or would file an EEOC complaint on March 9, 2011—at the end of a day on which she had repeatedly rebuffed their requests to meet with her after she had deliberately declined to follow their directives regarding Reich's performance review and PIP, after they told her that a continued failure to meet would be considered insubordinate, and after she told them "just to write [her] up"—itself is weak evidence of a retaliatory motive. The addition of the earlier unspecified "remarks" about unidentified employees having filed EEOC claims does not transmute

Colborn's already weak showing into a triable issue of retaliatory motive. (See *Morgan, supra,* 88 Cal.App.4th at p. 69 [circumstantial evidence of pretense must be specific and substantial to create triable issue of prohibited motive].)

In *Guz*, the court held that where the employee's "evidence raise[s], at best, only a weak suspicion that discrimination was a likely basis for his release" and the employer "has presented a plausible, and largely uncontradicted, explanation" of its nondiscriminatory reason for the termination, the employee has failed as a matter of law to raise a triable issue of pretext and the employer is entitled to summary judgment. (*Guz, supra*, 24 Cal.4th at pp. 369-370.) That is precisely the situation here.

### C. Colborn's Claim for Failure to Prevent Retaliation

Colborn's second cause of action, under Government Code section 12940, subdivision (k), alleges Chevron failed to take reasonable steps to prevent the alleged discrimination and retaliation against Colborn. A plaintiff cannot prevail on a claim for failure to prevent retaliation unless the plaintiff first establishes that retaliation occurred. (*M.F. v. Pacific Pearl Hotel Management LLC* (2017) 16 Cal.App.5th 693, 701; *Featherstone, supra,* 10 Cal.App.5th at p. 1166; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 288-289.) Having affirmed the grant of summary judgment to Chevron on Colborn's underlying retaliation claim, we must also affirm summary judgment on her claim for failure to prevent retaliation.

### DISPOSITION

The judgment is affirmed. Chevron shall recover its costs.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

MILLER, J.

*Colborn v. Chevron USA, Inc.* (A159040)